IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEHIGH VALLEY | : | |
| HOSPITAL-MUHLENBERG, | : | CIVIL ACTION |
|  Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MICHAEL O. LEAVITT, | : | NO. 05-CV-5296 |
|  Defendant. | : | |

<u>MEMORANDUM</u>

LEGROME D. DAVIS, J.                          AUGUST 30, 2006

  Plaintiff Lehigh Valley Hospital - Muhlenberg ("LVHM") brings this action pursuant to 42 U.S.C. § 1395oo(f)(1), which provides for judicial review of final administrative decisions concerning disputed claims for Medicare reimbursement. Plaintiff seeks declaratory relief and money allegedly due under the health costs reimbursement program of Title XIII of the Social Security Act ("Medicare"), 42 U.S.C. § 1395 <u>et</u> <u>seq</u>., for a loss sustained on the sale of its assets. Presently before this Court are Plaintiff's Motion for Summary Judgment (Doc. No. 13), Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment (Doc. No. 19), and Plaintiff's Reply (Doc. No. 22). For the reasons that follow, Plaintiff's Motion for Summary Judgment is denied, and Defendant's Cross-Motion for Summary Judgment is granted.

I.   BACKGROUND

A.   Statutory and Regulatory Background

  The Medicare statute creates a federally funded health insurance program for the aged and

the disabled. Pursuant to Part A of the Medicare program, the federal government reimburses health care providers for the "reasonable costs" of providing covered services to Medicare program beneficiaries. 42 U.S.C. § 1395f(b)(1); 42 C.F.R. § 413.9. "Reasonable costs" are the "costs actually incurred," less any costs "unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A).

The depreciation of buildings and equipment used in the provision of patient care is an "allowable cost" for which the provider is reimbursed. 42 C.F.R. § 413.134(a). An asset's annual depreciation amount is calculated by prorating the historical cost, i.e. the cost incurred by the present owner in acquiring the asset, over the asset's estimated useful life. Id. § 413.134(a), (b). Each year, the provider is reimbursed for a percentage of the annual depreciation.[1] Since the calculated annual depreciation is only an estimate of the asset's declining value, the sale or disposal of a depreciable asset may result in a gain, i.e. the asset is sold for more than its estimated remaining value, or a loss, i.e. the asset is sold for less than its estimated remaining value.[2] The treatment of the gain or loss under the Medicare program depends upon the manner of disposition of the asset. Id. § 413.134(f)(1). During the fiscal period at issue, a gain or loss from the bona fide sale of a depreciable asset was an allowable cost for which the provider was reimbursed.[3] Id. § 413.134(f)(2)(i).

---

[1] The percentage of annual depreciation reimbursed is equal to the percentage of the asset used for the care of Medicare patients.

[2] Depreciable assets may be disposed of through "sale, scrapping, trade-in, exchange, demolition, abandonment, condemnation, fire, theft, or other casualty." Id. § 413.134(f)(1).

[3] This regulation has since been amended. Under the amended regulations, a seller cannot restate the depreciation of an asset to reflect a loss on the sale of the asset. 42 U.S.C. § 1395x(v)(1)(O).

To obtain reimbursement from Medicare, health care providers file annual cost reports with their fiscal intermediary. 42 C.F.R. § 413.20. The intermediary audits the report and issues a Notice of Amount of Medicare Program Reimbursement ("NPR"), which informs the provider of the amount of reimbursement for that fiscal year. Id. § 405.1803. If the provider is not satisfied with the intermediary's determination, the provider may appeal to the Secretary's Provider Reimbursement Review Board ("PRRB"). 42 U.S.C. § 1395oo(a). Once the PRRB issues its decision, the Secretary's delegate, the Centers for Medicare and Medicaid Services ("CMS") Administrator, may elect to review the decision. Id. § 1395oo(f)(1). If the CMS Administrator declines to review the PRRB decision, the PRRB decision becomes the final agency decision. Id. The provider may seek review of the agency's final decision in federal district court. Id.

B.   Factual and Administrative History

Muhlenberg Hospital Center ("MHC") was a non-profit, 110-bed acute care hospital located in Bethlehem, Pennsylvania. In 1994, the Board of Trustees of MHC decided that it was necessary to assess the future of the hospital and to determine whether it could remain successful as an independent hospital or whether it should affiliate with a larger hospital. Pl's Statement of Material Facts ("Pl's Facts") ¶ 2 (citing Administrative Record ("A.R.") at 92, 109). MHC hired a consultant, Don Seymour of National Health Advisors, to assist MHC in determining its options for the future. Id. ¶ 5 (citing A.R. at 92).

In September 1994, Don Seymour presented a variety of options to MHC, ranging from a very loose affiliation with another hospital to a merger or sale. Id. ¶ 6 (citing A.R. at 92, 1045-74). MHC had the option to partner with a local non-profit hospital such as St. Luke's or Lehigh

Valley Hospital, a regional non-profit hospital such as Geisinger, or a for-profit hospital network such as Columbia/HCA or Allegheny. Id. ¶ 7 (citing A.R. at 92, 1045-74). In comparing the various options for MHC, the primary concern of the Board was the best way to fulfill its obligation to the community. A.R. 92, 97, 107, 115.

In 1997, the Board decided that its preferred partner was Lehigh Valley Health Network ("LVHN"), the parent of Lehigh Valley Hospital. Id. at 96; Pl's Facts ¶ 16. MHC and LVHN formed a steering committee, which held a series of meetings in May, June and July of 1997. A.R. at 101, 146, 533, 595, 644, 653. On October 28, 1997, MHC and LVHN executed an Affiliation Agreement ("Agreement"), pursuant to which MHC agreed to sell its assets to Lehigh Valley Health Services Organization ("LVHSO"), a subsidiary of LVHN.[4] See A.R. 768-825. Under the Agreement, LVHSO agreed to assume MHC's liabilities, which amounted to $43,336,847, to pay the transaction costs, to contribute the amount of money necessary to provide a balance of $20,000,000 in the Muhlenberg Foundation, to expand healthcare services, and to include five MHC Board members on LVHSO's Board.[5] Id.

On the date of the sale, November 30, 1997, the net book value of MHC's assets was

---

[4] The Affiliation Agreement was between LVHN, LVHSO, MHC, The Muhlenberg Corporation and Muhlenberg Continuing Care Corporation. See A.R. at 768. The Muhlenberg Corporation owned MHC, an assisted living facility, and a skilled nursing facility. Id. at 132. In addition to providing for the sale of MHC's assets to LVHSO, the Affiliation Agreement also provided for "a substitution of parent organizations so that LVHN became the sole corporate member of all of [The Muhlenberg Corporation's] tax exempt organizations, excluding [MHC]." Id. at 132.

[5] Prior to the sale, LVHSO's Board consisted of 20 members. Therefore, after the sale, LVHSO's Board consisted of 25 members.

$104,408,209.[6] Id. at 1296.  Deloitte & Touche determined that the fair market value of MHC's fixed and intangible assets on November 20, 1997, a few days before the sale, was $62,640,000. Id. at 830.

In its fiscal year 1997 cost report, MHC claimed reimbursement of $4,277,421 for the losses it incurred on the sale of its assets to Lehigh Valley.  Pl's Facts ¶ 30.  The Intermediary reviewed MHC's final cost report and disallowed the claimed loss on the basis that the sale was not a bona fide sale.  Id. at 1251.  On June 22, 2000, MHC timely appealed the decision of the Intermediary to the PRRB.

On August 12, 2005, the PRRB denied MHC's claimed reimbursement and upheld the Intermediary's disallowance of the claimed loss on sale.  A.R. at 6-10.  The PRRB found that the transaction between MHC and LVHSO did not meet the criteria for a bona fide sale because the sale price for the assets did not equate to cash and cash equivalents.  Id. at 9.  In addition, the PRRB found that there was no valuation furnished for other facilities sold other than the witness' testimony that the skilled nursing facility and assisted living facility had a negative book value and that these assets were transferred to LVHSO as part of the sale.  Id.  The PRRB held that the evidence demonstrated that MHC did not receive fair market value as consideration for the assets transferred in the sale transaction.  Therefore, the PRRB concluded that MHC was "not entitled to reimbursement for a loss on sale because it failed to demonstrate that the transaction between itself and LVHSO was a bona fide sale."  Id.

On September 20, 2005, the CMS Administrator declined to review the PRRB decision.

---

[6] The net book value of $104,408,209 consists of $48,748,442 of cash and investments, $13,481,670 of other current assets and $42,178,097 of other assets.  A.R. at 1296.

5

As a result, the PRRB decision became final. On October 7, 2005, MHC filed this suit appealing the PRRB's decision. Both parties have submitted motions for summary judgment.

II.     LEGAL STANDARD

In determining which party is entitled to summary judgment, judicial review of the agency's decision is governed by 42 U.S.C. § 1395oo(f)(1), which incorporates the standard of review of the Administrative Procedures Act ("APA"), 5 U.S.C. § 706. See 42 U.S.C. § 1395oo(f)(1). Under the APA, a court may set aside a final agency action when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or when the action is "unsupported by substantial evidence" in the administrative record taken as a whole. 5 U.S.C. § 706(2)(A), (E); see also Monsour Medical Center v. Heckler, 806 F.2d 1185, 1191 (3d Cir. 1986).

A reviewing court must give "substantial deference" to an agency's interpretation of its own regulations. Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994). The court must "accept the agency's view so long as the interpretation is within the range of reasonable meanings that the words of the regulation admit." Butler County Memorial Hospital v. Heckler, 780 F.2d 352, 355-56 (3d Cir. 1985). Broad deference is "particularly appropriate in the context of the complex scheme of Medicare reimbursement." Monongahela Valley Hospital v. Sullivan, 945 F.2d 576, 593 (3d Cir. 1991); see also Thomas Jefferson Univ., 512 U.S. at 512 (quoting Pauley v. BethEnergy Mines, Inc., 501 U.S. 650, 697 (1991)); Butler, 780 F.2d at 356 (cautioning against disturbing the appropriate allocation of government functions).

If an agency's factfinding is supported by substantial evidence, a reviewing court lacks power to reverse either those findings or the reasonable regulatory interpretations that an agency

manifests in the course of making such findings of fact. Monsour Medical, 806 F.2d at 1191; see also 5 U.S.C. § 706(2)(E). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Mercy Home Health v. Leavitt, 436 F.3d 370, 380 (3d Cir. 2006) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)); see also Monsour Medical, 806 F.2d at 1190 (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951)) ("it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict").

III. DISCUSSION

Plaintiff argues that this Court should reverse the PRRB's decision because it is arbitrary and capricious, contrary to law and not supported by substantial evidence. Specifically, plaintiff argues that (1) the transaction between MHC and LVHSO was a bona fide sale within the meaning of 42 C.F.R. § 413.134(f), see Pl's Memo. at 11-18, and (2) the sale appropriately excluded valuation for the skilled nursing facility and the assisted living facility, see id. at 18.[7] See also Pl's Reply at 1-5.

A.   Bona Fide Sale

In order for a loss sustained by the sale of depreciable assets to be eligible for Medicare reimbursement, the sale must be a bona fide sale. See 42 C.F.R. § 413.134(f)(2)(i). In the instant matter, the PRRB concluded that MHC was not entitled to reimbursement for a loss on sale because it failed to demonstrate that the transaction between itself and LVHSO was a bona fide

---

[7] Plaintiff also argues that the sale of MHC assets was not a "related party" transaction. Pl's Memo. at 19-24. However, since the PRRB did not find that the sale of MHC assets was a related party transaction, this Court sees no need to address this argument. See 42 U.S.C. § 1395oo(f)(1) (providing for judicial review of final administrative decisions); A.R. at 7-10.

sale. A.R. at 9.  The PRRB based its conclusion on two findings: (1) the criteria for a bona fide sale was not met because the sale price for the assets did not equate to cash and cash equivalents, and (2) the evidence demonstrated that MHC did not receive fair market value as consideration for the assets transferred in the sale transaction. Id.  The issue before this Court is whether the PRRB's decision that MHC failed to demonstrate that the transaction was a bona fide sale was arbitrary, capricious, contrary to law or unsupported by substantial evidence.

      1.      Sale Price

The PRRB found that the transaction "did not meet the criteria for a bona fide sale because the sale price for the assets did not equate to cash and cash equivalents." Id.  Although the PRRB did not set forth the rationale for its findings in great detail, this finding relies on the discussion contained in Program Memorandum A-00-76 ("PM A-00-76"),[8] which clarifies how to evaluate whether a bona fide sale has occurred in the non-profit context. See id. at 1307-10.  According to PM A-00-76, a review of the allocation of the sales price among the assets sold is appropriate when analyzing whether a bona fide sale has occurred.[9] Id. at 1310.  If no portion of the sales price is allocated to the fixed (including the depreciable) assets, the fixed assets have effectively been provided at no cost. Id.  Since consideration was exchanged for the business as a whole, this type of transaction is not considered a donation of fixed assets, rather, it is considered

---

[8] PM A-00-76 was issued by the Health Care Financing Agency ("HCFA"), the predecessor to CMS. See A.R. at 1307-10.

[9] By way of background, for Medicare reimbursement purposes, the purchase price is first allocated to the cash, cash equivalents and other current assets, i.e. the tangible assets.  After that allocation has been completed, any remaining amount of the purchase price will be allocated to the fixed (including the depreciable) assets.  In the event that the sales price is less than the value of the tangible assets, no portion of the purchase price will be allocated to the fixed assets.

a non-bona fide sale of the fixed assets. Id.  In the instant matter, when MHC allocated the purchase price to its assets, no portion of the purchase price was allocated to the fixed assets.[10] See A.R. at 1296.  Therefore, under the rationale of PM A-00-76, a bona fide sale of assets had not occurred.

Plaintiff argues that the PRRB's reliance on PM A-00-76 is misplaced because it constitutes retroactive rulemaking. Pl's Reply at 1-4.  Plaintiff bases this argument on the fact that the implementation date for PM A-00-76 was October 19, 2000, almost three years after the sale of assets.  However, PM A-00-76 states that, since the memorandum "does not include any new policies regarding mergers or consolidations involving non-profit entities," there is no "effective date," and it is to be applied to "all cost reports for which a final notice of program reimbursement has not been issued and to all settled cost reports that are subject to reopening." A.R. at 1307-10.  PM A-00-76 does not introduce a new rule, rather it clarifies how to evaluate whether a bona fide sale has occurred in the non-profit context.  Since non-profit organizations are often driven by the interests of the community at large, rather than a desire to obtain the highest price for their assets, it can be difficult to determine whether a bona fide sale has occurred.  Therefore, guidance was needed.  Since PM A-00-76 merely provides clarification, the PRRB's reliance on PM A-00-76 does not constitute "retroactive rulemaking."

Plaintiff also argues that PM A-00-76 is applicable by its terms only to mergers and consolidations. Pl's Reply at 1-4.  PM A-00-76 is meant to clarify application of the regulations to mergers and consolidations. See A.R. at 1307.  However, given that the considerations

---

[10] The purchase price of $43,336,847 was less than the value of the cash and investments, $48,748,442. See A.R. at 1296.

9

relevant to determining whether a non-profit organization has engaged in a bona fide sale are the same whether a sale of assets (like the instant one) or a consolidation or a merger is at issue, this Court finds that it was reasonable for the PRRB to adopt the rationale contained in PM A-00-76. Therefore, the PRRB's reliance on PM A-00-76 was not arbitrary, capricious or contrary to law.

Plaintiff also argues that the PRRB incorrectly determined that the purchase price was less than the cash and cash equivalents by "failing to account for the value of the promises given to develop the campus and provide future service." Pl's Memo. at 15.  In other words, plaintiff contends that the PRRB's decision not to include the value of the promises to develop the campus and provide future service in the purchase price was arbitrary, capricious or contrary to law.  This Court disagrees.  The PRRB's decision not to include the value of future services and development in the purchase price was well "within the range of reasonable meanings that the words of the regulation admit." See Butler, 780 F.2d at 355-56.  Plaintiff has not identified language in the regulations that prohibits the PRRB's interpretation.  In fact, when comparing the purchase price to the value of the cash and cash equivalents in order to determine whether any of the purchase price was allocated to the fixed assets, it is logical to use the value of the purchase price reported in the "Allocation of Purchase Price" the provider submitted to its intermediary. Thus, the value of the purchase price should not include the value of a promise of future services and development. See A.R. at 1296.  The PRRB correctly excluded "the value of the promises to develop the campus and provide future service" from the purchase price when it compared the purchase price to the value of MHC's cash and cash equivalents.

2.      Fair Market Value

The PRRB found that the evidence demonstrated that MHC did not receive fair market

10

value as consideration for the assets transferred in the sale transaction. A.R. at 9.  Plaintiff argues that the PRRB's determination that MHC did not receive fair market value is not supported by substantial evidence. Pl's Memo. at 16-18.  This Court disagrees.

A gain or loss from the bona fide sale of a depreciable asset is a reimbursable cost. 42 C.F.R. § 413.134(f)(2)(i).  According to the Provider Reimbursement Manual ("PRM"),

> A bona fide sale contemplates an arm's length transaction between a willing and well informed buyer and seller, neither being under coercion, for reasonable consideration.  An arm's length transaction is a transaction negotiated by unrelated parties, each acting in its own self interest.

PRM, Ch. 1, § 104.24.  Reasonable consideration is a required element of a bona fide sale. Therefore, a comparison of the sale price with the fair market value of the assets is required. See Germantown Hospital & Medical Center v. Mutual of Omaha Ins. Co., P.R.R.B. Dec. No. 2004-D36, 2004 WL 3049341, at *17 (P.R.R.B. Oct. 28, 2004).

> Fair market value is the price that the asset would bring by bona fide bargaining between well-informed buyers and sellers at the date of acquisition. Usually the fair market price is the price that bona fide sales have been consummated for assets of like type, quality, and quantity in a particular market at the time of acquisition.[11]

42 C.F.R. § 314.134(b)(2).  A large disparity between the sales price and the fair market value indicates the lack of a bona fide sale. Germantown Hospital, 2004 WL 3049341, at *17.

At the time of the sale, the book value of MHC's assets was $104,408,209.  Pursuant to the sale, LVHSO agreed to assume MHC's liabilities, which amounted to $43,336,847, to pay the transaction costs, to contribute the amount of money necessary to provide a balance of

---

[11] This definition incorporates the concept of an arm's length transaction in that fair market value is calculated based on the price that would be obtained in an arm's length transaction. See Ashland Regional Medical Center v. Blue Cross & Blue Shield Ass'n, PRRB Dec. No. 98-D32, 1998 WL 102268, at *6 (P.R.R.B. Feb. 27, 1998).

$20,000,000 in the Muhlenberg Foundation,[12] to expand healthcare services, and to include five MHC Board members on LVHSO's Board.

Substantial evidence supports the conclusion that community considerations were paramount and the fair market value was an afterthought. In comparing the various options for MHC, the primary concern of the Board was the best way to fulfill its obligation to the community. A.R. 92, 97, 107, 115. For instance, the idea of a sale to Columbia/HCA was rejected because the Board felt that the investments necessary for the Muhlenberg campus to grow and to serve its community were not necessarily in Columbia/HCA's vision. A.R. at 112; see also id. at 94 (rejecting a transaction with Allegheny because, inter alia, it "wouldn't improve the quality of care" and "wouldn't help bring additional services to the community"); id. (rejecting a transaction with St. Luke's because "it would probably result in a consolidation of services ... and that would inhibit that access to the community"). Mr. Seymour, the independent consultant hired by MHC to evaluate MHC's options, testified that "it's not just about money if you're a non-profit" and that MHC was "more interested in doing – dealing [sic] with someone they were inclined to deal with and doing the right thing for the community rather than seeking the highest price for the facility." A.R. at 107-108. Mr. Macaulay, the Chief Financial Officer for MHC at the time of the sale, testified that "obtaining the maximum price was not the sole purpose of th[e] transaction." Id. at 128.

Substantial evidence also supports a conclusion that MHC did not make a serious effort to negotiate the best price available for its assets. Mr. Macaulay testified that if a higher price

---

[12] The amount of money actually contributed to the Muhlenberg Foundation appears to be $18.7 million. See A.R. at 139-40.

had been offered by Columbia/HCA, his recommendation would have been not to accept it. Id.
Mr. Seymour testified that a relationship with Columbia would have brought "little benefit, other than probably writing a big check."[13] Id. at 94.  However, MHC never solicited an offer from Columbia/HCA. Id. at 127.  There is no evidence that MHC attempted to maximize the sale price, as would be expected in an arm's length transaction.[14] See Germantown Hospital, 2004 WL 3049341, at *18.

Substantial evidence supports the conclusion that MHC was not concerned with obtaining fair market value for its assets.  As a result, MHC transferred its assets, which had a book value of $104,408,209, for the amount of liabilities on its books, $43,336,847, plus a potential $20 million contribution to the Muhlenberg Foundation.  Plaintiff argues that MHC obtained fair market value for the assets transferred because they were exchanged for the assumption of liabilities, the contribution to the Foundation and the value of services to be provided to the community in the future. Pl's Memo. at 16-17.  However, PM A-00-76 specifically states that "non-monetary consideration, such as a seller's concession from a buyer that the buyer must continue to provide care for a period of time ... may not be taken into account in evaluating the

---

[13] Mr. Seymour testified that he believed the price tag offered by Columbia would have been "110 million bucks." A.R. at 94.  Other testimony suggested that Columbia would have offered a price that was "much less" than Mr. Seymour's figure. A.R. at 117.

[14] Plaintiff argues that the instant case presents a situation similar to that in Ashland Regional Medical Center v. Blue Cross & Blue Shield Ass'n, PRRB Dec. No. 98-D32, 1998 WL 102268 (P.R.R.B. Feb. 27, 1998) and Lac Qui Parle Hosp. of Madison v. Blue Cross & Blue Shield Ass'n, PRRB Dec. No. 95-D37, 1995 WL 933980 (P.R.R.B. May 10, 1995). However, in both of those cases, the Board made a "genuine and positive attempt to solicit potential buyers" for the hospital. See Ashland, 1998 WL 102268, at *12; Lac Qui Parle Hosp., 1995 WL 933980, at *9.  In the instant matter, while MHC discussed various options, it only pursued one potential buyer, Lehigh Valley.

reasonableness of the overall consideration." A.R. at 1309.  Therefore, the PRRB correctly excluded the value of services to be provided in the future from its analysis of the consideration provided.

       3.      Conclusion

The PRRB's finding that the criteria for a bona fide sale was not met because the sale price for the assets did not equate to cash and cash equivalents was supported by substantial evidence and was not arbitrary, capricious or contrary to law.  In addition, the PRRB's finding that MHC did not receive fair market value as consideration for the assets transferred in the sale was supported by substantial evidence and was not arbitrary, capricious or contrary to law.  Based on these findings and the evidence presented, the PRRB correctly concluded that MHC failed to demonstrate that the transaction between itself and LVHSO was a bona fide sale.

B.      Skilled Nursing Facility and Assisted Living Facility

The PRRB found that "there was no valuation furnished for other facilities sold other than the witness' testimony that the [skilled nursing facility] and assisted living facility had a negative book value and that these assets were transferred to LVHSO as part of the sale." A.R. at 9. Plaintiff argues that the skilled nursing facility and the assisted living facility "were appropriately excluded in calculating the gain or loss on sale for MHC." Pl's Memo. at 18.  However, PRRB did not find that the skilled nursing facility and assisted living facility should have been included in calculating the gain or loss on sale.  Rather, in trying to determine whether fair market value had been received as consideration for the sale, the PRRB found that there was no evidence indicating the value of the skilled nursing facility or the assisted living facility other than a witness' testimony that they had a negative book value.  Therefore, the PRRB did not consider

14

the potential negative book value of the other facilities sold in determining the consideration received.[15]

IV.     CONCLUSION

The PRRB's determination that the transaction between MHC and LVHSO was not a bona fide sale was supported by substantial evidence and was not arbitrary, capricious or contrary to law.  Accordingly, this Court grants Defendant's Cross-Motion for Summary Judgment and denies Plaintiff's Motion for Summary Judgment.  An appropriate order follows.

---

[15] Plaintiff also argues that the PRRB's finding that the skilled nursing facility and the assisted living facility were transferred to LVHSO as part of the sale was not supported by substantial evidence. Pl's Memo. at 18.  However, again, plaintiff misreads the PRRB's finding. The PRRB did not find that the skilled nursing facility and the assisted living facility were transferred to LVHSO as part of the sale, rather, the PRRB referred to the witness' testimony. Admittedly, the PRRB's finding is a bit confusing, as the record is clear that the skilled nursing facility and the assisted living facility were transferred to LVHN, LVHSO's parent company. See A.R. at 130-33, 768-824.  However, since the PRRB's finding was that there was insufficient evidence regarding the value of the assisted living facility and the skilled nursing facility, whether it was transferred to LVHN or LVHSO would not have affected the analysis.